UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BETTY S. HOWARD,

Plaintiff,

      v.          Case No. 05-73557

COMMISSIONER OF SOCIAL SECURITY,  HONORABLE AVERN COHN

Defendant.

_____/

**MEMORANDUM AND ORDER ADOPTING**
**THE MAGISTRATE JUDGE'S REPORT & RECOMMENDATION**

**I. Introduction.**

This is a social security case. Plaintiff Betty S. Howard (Howard) appeals from the final determination of the Commissioner of Social Security (Commissioner) denying her application for Disability Insurance Benefits (DIB). An Administrative Law Judge (ALJ) ruled that Howard was not entitled to benefits. Howard appealed and Appeals Council denied review of the decision. The ALJ's decision became the final decision of the Commissioner.

Howard filed this action for judicial review under 42 U.S.C. § 405(g). Howard and the Commissioner filed motions for summary judgment and the matter was referred to a magistrate judge for consideration. The magistrate judge issued a report and recommendation (R&R) that the ALJ's decision be affirmed. Howard objects to the R&R's conclusion that substantial evidence supports the ALJ's denial of benefits. The Commissioner did not object to the R&R's conclusion. For the reasons stated below, the

1

Commissioner's motion is GRANTED, Howard's motion is DENIED. The case is DISMISSED.

## II. Background.

### A.

Howard was born on March 20, 1957. She is married and has a teen-aged daughter. Howard graduated from high school and worked as a school bus driver until March, 1997.  On March 7, 1997, Howard's bus was involved in an accident. Howard was brought to the emergency room.  Howard completed a patient history form and indicated that she was being treated for a bad knee at the time.[1] Howard was treated for a right-arm fracture as a result of the bus accident.

On March 10, 1997, Howard visited Dr. Ishwar Dass for upkeep of her fracture. On March 17, 1997, Howard visited Dr. Dass, who indicated that her x-rays showed good alignment of her fractured wrist. On March 31, 1997, Howard visited Dr. Walter, who opined that Howard's x-rays were satisfactory.

In May, 1997, Howard visited Dr. William Raue, for an second opinion as to her post-accident health status. Dr. Raue examined Howard and ordered her off work and prescribed physical therapy.

Howard began to attend physical therapy. Howard's physical therapist, Linda Gibbs, noted in a May 21, 1997, letter to Dr. Dass that Howard reported reduced pain in her right wrist and hand with an increased range of motion in her right wrist, fingers, and hand. In a June, 1997, visit to Dr. Dass, Howard's x-rays showed evidence of carpal

---

[1] March, 1996, imaging results show mild to moderate degenerative changes to Howard's right knee.

2

tunnel syndrome. In August, 1997, Dr. Dass found that Howard's "mild" carpal tunnel syndrome did not warrant surgery. He indicated that he did not believe Howard had "any incentive to return back to work in view of her subjective complaints of paresthesia and pain."

In August and September, 1997, Howard continued to visit Gibbs for physical therapy. Gibbs reported that Howard showed objective signs of improvement, but noted that Howard complained of continued finger, hand, and wrist numbness. In October, 1997, Dr. Dass, noting that Howard had sustained a radial styloid fracture from her bus accident, recommended a radial nonunion operation to relieve her continued wrist problems. By December, 1997, Howard's fracture showed progressive healing and the surgery was no longer required.

In January, 1998, Howard paid a visit to her primary care physician Dr. Benedict, for an annual checkup.[2] On February, 1998, a follow up visit was paid to Regional Medical Imaging for a bilateral mammography. There was no evidence of spiculated mass or suspicious calcifications within either breast.

In June, 1998, Howard visited an orthopedic specialist, Dr. Michelle Henderson. Dr. Henderson examined Howard and noted that Howard's distal radius interarticular wrist fracture had healed and she found that Howard was able to perform her job as a

---

[2] Dr. Benedict has always been Howard's primary care physician, but this is the earliest medical evidence from Benedict in the record.

bus driver. Dr. Henderson restricted Howard from lifting more than 15 pounds for six months.[3]

In November, 1998, Howard visited Dr. Orlando Benedict Dr. Benedict noted that Howard had undergone injections and physical therapy for degenerative problems in both knees[4].

There is no medical documentation from December 1998 through June 1999.

In June, 1999, orthopedic specialist Dr. Michael Sorscher, examined Howard and opined that her wrist injury would improve with exercise, ice, and anti-inflammatory medication.

In September, 1999, Howard visited Theresa Kanous, a registered occupational therapist. Kanous performed a Functional Capacity Evaluation (FCE).  The FCE revealed that Howard demonstrated an ability to perform work at the light exertional level and "was not totally disabled."

On October 01, 1999, Howard visited Dr. Benedict, after experiencing low back and hip pain[5]. X-ray's revealed mid degenerative joint changes involving the right hip joint and postsurgical changes in the visualized lower lumbar spine. Howard says Dr. Dass recommended "early retirement due to the ongoing back problems when coupled

---

[3] Sometime into the late 1990's, Howard applied for and began receiving DIB. An explanation for this award is nowhere in the administrative record or in the papers filed by the parties.  While this information may not be required to determine whether substantial evidence supports the ALJ's decision, it is necessary for a complete understanding of the facts.

[4] Dr. Benedict was not specific as to what type of physical theory or when it took place.

[5] Sometime in the late 1980's, Howard had two back surgeries.

with the wrist injury." Later that month, Dr. Dass observed on examination that Howard had "very good range of motion" in the right upper extremity and exhibited normal movement. He noted that her symptoms were under control with Advil.

On February, 2000, Howard visited Dr. Benedict for her annual checkup, and found that there were no significant changes in the appearance of her breast. This visit was followed up with another visit to Regional Medical Imaging. Again, there was no dominant masses or suspicious calcifications.

Other than the annual checkup's with Dr. Benedict, there is no medical documentation from November, 1999, through November 2001.

In December, 2001, Howard visited James E. Kure, M.D., a cardiologist, for a cardiac evaluation regarding an abnormal stress test.[6] Dr. Kure performed a physical exam on Howard. In a December 19, 2001, letter, Dr. Kure informed Dr. Benedict that Howard reported experiencing chest pressure after engaging in strenuous physical activity. Dr. Kure reported that although Howard had been instructed to avoid heavy lifting, she was able to do her housework without substantial limitations. This same month, Howard underwent cardiac catheterization after experiencing chest pain. Dr. Kure prescribed medication. Howard was doing fairly well by January, 2002, experiencing only rare episodes of angina. Dr. Kure advised Howard to exercise aerobically 30 minutes a day to lose weight. Also, Dr. Kure expressed concern over her smoking one pack of cigarettes a day.

In August, 2002, Howard visited Dr. Sorscher and reported severe pain while

---

[6]It is unclear as to when Howard was first given a stress test.

walking, as well as problems with bed mobility. On examination, Howard exhibited pain in the groin and the buttock. Dr. Sorscher's impression was that Howard had a degenerative disease of the right hip.

On September, 2002, Howard visited Dr. Sorscher and recieved a cortisone injection to the right hip and reported an "immediate improvement in symptoms."

On December 31, 2002, the Commissioner stopped paying DIB. Howard reapplied for DIB on January 24, 2003.

In February, 2003, Dr. Benedict stated in a letter that he had treated Howard for diabetes, degenerative joint disease of the hips, hyperlipidemia, coronary heart disease, and high blood pressure. Dr. Benedict concluded that Howard was unable to work due to these conditions.

In March, 2003, Howard visited M. Dhladhl. Dhladla performed a Physical Residual Functional Capacity Assessment and noted that Howard had diabetes and arthritis in the right hip, but still retained the ability to lift 20 pounds occasionally and 10 pounds frequently. The Assessment results concluded that Howard could stand, walk, or sit for up to six hours in an eight-hour workday.

On March 26, 2003, a Notice of Disapproved Claim addressed to Howard, stated that after a periodic review of her file, it was determined that Howard was not disabled under the Social Security Act as of December 31, 2002.

In November, 2003, Dr. Walter Harper, examined Howard and performed image tests on her cervical spine, left wrist and right ankle. The tests showed good results. In January, 2004, Dr. Kure stated that Howard, then 279 pounds, was "doing fairly well." He encouraged her to lose weight and continue to monitor her hypertension,

hyperglycemia, and hyperlipidemia.

**B.**

On February 16, 2005, the ALJ held a hearing on Howard's DIB application. Howard testified that she had not worked since March 7, 1997, due to the bus accident. Howard testified that following the accident she worked as a high school hall monitor but was unable to perform the job due to knee, hip and leg pain. Howard said that she had not attempted any other type of work. Howard said that before working as a bus driver she worked as a cashier, but was no longer able to perform that job because of her inability to stand for long periods of time and right hand numbness.

Howard said that she had back pain for years and underwent two back surgeries in the late1980's. She said surgeries helped reduce her level of discomfort, but that she continued to experience level "eight" pain on a scale of one to ten. Howard said that she continued to take medication for her back pain, yet she had not gone to physical therapy since her last surgery. Howard said that she had knee problems since about 1993 and had trouble climbing up stairs. Additionally, Howard said that she had experienced a heart attack, and that diabetes caused her to wear reading glasses, made her feet swell, and caused constant fatigue. Howard said that she experienced daily chest pains and hip spurs.

Howard testified she could stand for up to two hours in an eight-hour workday, but would need to lie down thereafter to relieve pressure in her lower back and hips. Howard said she regularly awoke at 5:30 a.m. and went to bed around midnight; Howard characered her sleep pattern as "up and down all night long" as a result of pain. Howard said she performed housework with the help of her husband and

daughter. Howard said she spent approximately 45 minutes shopping for groceries twice a month, visited her mother regularly and dined out occasionally. Howard said she spent most of her day at home watching television because hip discomfort required her to lie down two to three times a day for approximately half an hour.

The ALJ posed a hypothetical question to the Vocational Expert (VE), that assumed an individual of Howard's age, education, and vocational background, who could lift up to 10 pounds, required a sit/stand option throughout the day, and could not have repetitive use of the right hand. The VE concluded that although Howard could not return to her past relevant work, she could perform unskilled, sedentary work as a video surveillance monitor, information clerk, and visual inspector.

### C.

The ALJ issued his decision on August 16, 2005. The ALJ found that Howard was not disabled within the meaning of the Social Security Act. The ALJ concluded that, based on the testimony and evidence, Howard had not engaged in any substantial gainful activity since mid 1997. The ALJ noted Howard's testimony that she fractured her right wrist during a school bus accident. The ALJ relied on an evaluation from September, 1999, showing Howard capable of performing a wide range of light work activity. Further, the ALJ said Dr. Dass noted that it was "unlikely" Howard would be "totally disabled from any and all occupations."

The ALJ recognized Howard's degenerative disease involving her right knee, mild degenerative changes at the right hip joint, and chest pains. In addition, the ALJ noted that Howard was diagnosed with diabetes mellitus and, at 5 feet 7 inches tall and consistently weighing more than 250 pounds, classified her as obese.

The ALJ found Howard impaired due to a right wrist fracture, coronary artery disease, diabetes mellitus, obesity, and degenerative joint disease of the right hip and knee. The ALJ concluded that these impairments were "severe" under the Regulations. However, the ALJ agreed with the State of Michigan agency medical consultants who in concluding that these conditions, alone and in combination, do not meet or medically equal the criteria for any listed impairment(s) appearing in Appendix 1 to Subpart P, Regulations No. 4.[7]

The ALJ, in deciding Howard's "residual functional capacity"[8] considered Howard's testimony on symptoms and pain. The ALJ also considered the lack of x-rays, MRI's and CT scans of Howard's spine. Further, the ALJ noted that Howard worked full-time as a school bus driver for nearly a decade after her knee and back surgeries without any major problems. The ALJ also noted the lack of medical evidence of a heart attack.

The ALJ recognized Howard's incident of severe chest pain in December, 2001, where Dr. Kure diagnosed Howard with coronary artery disease. However, the ALJ relied upon Dr. Kure's January, 2003, report that Howard was doing reasonably well on medication alone.

The ALJ did not find Howard's testimony on diabetic symptoms to be reliable.

---

[7] There is no documentation, within the record, reflecting the State of Michigan agency medical consultants conclusion.

[8] The term "residual functional capacity" is defined in the Regulations as the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks (20 CFR § 404.1545 and Social Security Ruling 96-8p).

Instead the ALJ relied on a *Review of Symptoms* checklist from December, 2003, showing that Howard's eyes, neurological, and musculoskeletal findings were all normal.

The ALJ also considered Howard's routine medical attention. Howard saw her cardiologist, Dr. Kume, only once a year, and her primary care physician, Dr. Benedict, every six months. Moreover, she had not seen her orthpaedist, Dr. Sorscher, for nearly three years. The ALJ noted that Howard did not receive the kind of regular medical attention one might expect of a totally disabled individual.

Finally, the ALJ considered Howard's daily living activities, such as driving, grocery shopping, dining out, and visiting her mother. The ALJ suggested that perhaps Howard could do more, and is in less pain, than she admitted at the hearing.

The ALJ gave minimal weight to Dr. Benedict's opinion that Howard's many impairments "disable" her from work. The ALJ decided that this opinion was contrary to Dr. Benedict's otherwise unremarkable clinical observations and findings.

The ALJ concluded that Howard could work in a position that provides a sit/stand option. The ALJ decided that Howard could lift no more than 10 pounds at a time, and could not use her right hand for any repetitive activities. There were no other exertional or nonextertional limitations in evidence.

The ALJ agreed with the VE that Howard would be incapable of returning to her past relevant work, but that, under the Medical-Vocational Guidelines, 20 CFR § 404.1567, Howard was capable of performing a significant range of sedentary work. The ALJ denied Howard's application for DIB.

### III. Discussion

### A. Legal Standard

Judicial review of a Social Security disability benefits application is limited to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997). A reviewing court may not resolve conflicts in the evidence or decide questions of credibility. Brainard v. Sec'y of Health & Human Servs., 889 F.2d 679, 681 (6th Cir. 1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The substantiality of the evidence must be based upon the record taken as a whole. Futernick v. Richardson, 484 F.2d 647, 649 (6th Cir. 1973). "[T]he decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997). The substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference from the courts." Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986). The portions of the MJRR that the claimant finds objectionable are reviewed de novo. See 28 U.S.C. § 636(b)(1)(C); Smith v. Detroit Fed'n of Teachers, Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).

### B. Analysis.

### 1. Introduction.

The regulations outline a five-step sequential evaluation process to decide whether a person is disabled. The Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. § 416.920(a). After identifying Howard's impairment, ALJ determined that Howard did not satisfy Step Three. The issue in this case, however, is whether the ALJ erred by omitting "low back pathology" as a "severe impairment" under Step Two. Step Two defines a non-severe impairment as one that does not "significantly limit [the] physical or mental ability to do basic work activities." The same regulation defines "basic work activities" as "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." Howard objects to the R&R's conclusion that the ALJ did not err in omitting "low back pathology" as a "severe impairment" under Step Two, and inferentially says she would satisfy the rest of the requirements if "low back pathology" had been included.

### 2. The Motions.

### A.

Howard's motion asks the Court to remand the case for a computation of

benefits, or in the alternative, remand it for an appropriate and thorough assessment of her low back pathology and its effect on her residual functional capacity. Howard says the ALJ erred by omitting "low back pathology" from the list of impairments he found severe at Step Two of his analysis, and that this taints the ALJ's conclusion that she could perform a limited range of sedentary work. Howard also says the ALJ neglected to refer to Social Security Ruling (SSR) 96-9p, which lists several factors to be considered when finding that a claimant is capable of only a limited range of sedentary work.

The ALJ said "there is no clinical support in the record for complaints of severe and persistent back pain. There are no x-rays, MRI's, CT scans, or comparable documentation of the claimant's lumbosacral spine." Howard says that besides evidence of her two back surgeries, there is radiographic evidence of the prior low back surgery, according to her October 1, 1999, visit with Dr. Benedict.

As to Howard's second argument, Howard says that the ALJ did not even consider SSR 96-9p. SSR 96-9p requires ALJ's to consider several factors in evaluating whether or not an occupational base is seriously eroded for those workers only capable of a restricted range of sedentary work.[9] Howard says that if the ALJ would have considered the factors, he would have considered her lack of any transferable skills in determining whether or not there remained a restricted range of sedentary work for her to perform. Howard says the SSR 96-9p indicates that most unskilled sedentary jobs require good use of both hands. Howard says she would be incapable of performing these jobs with a bad right arm. The Commissioner says the ALJ noted that,

---

[9] The Factors are: individualized determination, considering age, education, work experience and skills the individual may have that are transferable to other work.

in 1998, Dr. Henderson examined Howard and observed that she had excellent range of motion in the wrist and that she was able to lift and handle books with both hands. Further, the Commissioner says the SSR 96-9p advised consultation with a vocational expert when the manipulative limitation is not significant and the ALJ did include a restriction against repetitive activities with the right hand, clarifying that Howard should not "overuse" the right hand.

**B.**

In his R&R, the magistrate judge found that substantial evidence supported the ALJ's finding that Howard was not disabled. The R&R concluded that Howard's back condition did not contribute to her work-related limitations. Further, the R&R noted that, as discussed by the ALJ, the fact that Howard worked for several years as a bus driver after undergoing back surgeries belies her claim that she suffers from "severe and persistent back pain" to a disabling extent.

The R&R says that after review of Howard's entire medical history, he cannot find any basis for concluding that Howard's back pain requires more stringent work limitations than those set forth in the RFC.

Regarding to the SSR 96-9p, the R&R recognized that a bad right arm would narrow the sedentary, unskilled job base and should be included to ensure an accurate VE response. None of the VE's job findings (video surveillance monitor, information clerk, ID clerk, and visual inspector) implicate the repetitive use of her dominant hand; thus the R&R decided that the ALJ had properly considered the SSR 96-9p factors. The R&R concluded that Howard did not present a particularly strong case for benefits, and, as whole, the record pointed overwhelmingly to a finding of non-disability.

### 3. Objections.

Howard objected to the R&R's finding that substantial evidence supported the ALJ's decision that she was not disabled.

Howard says (1) that the ALJ misread the existing record regarding Howard's back condition that resulted in two surgeries and ongoing radiographic evidence of pathology treated with painkillers; and (2) the R&R failed to recognize the effects of Howard's back condition on her ability to work.

### 4. Conclusion.

The Court finds that substantial evidence supports the ALJ's conclusion that Howard's back condition complaints were not credible to qualify as a "severe impairment." Substantial evidence supports the ALJ's conclusion that Howard's back condition did not contribute to her work-related limitations because: 1) she was able to resume working as a bus driver after undergoing several back surgeries, 2) Howard's activities of daily living appeared to have been diverse and not significantly limited by back problems and 3) the lack of regular medical attention.

It is clear that Howard is an unhealthy individual, who has had several requests from Dr. Kure to lose weight and quit smoking. Further, though Howard has had many health problems throughout the years, none of her problems have required surgery. Finally, many of her Doctors have testified that her health problems have cleared up throughout the years or are under control with medication.

The R&R agreed with the ALJ's RFC finding as to her job limitations, which more than adequately accounted for limitations resulting from her claimed back impairment.

15

While it is Howard's burden to prove disability, it is the Commissioners burden to demonstrate that there is substantial evidence supporting its decision. The Court agrees, after a full review of the record, that substantial evidence supports the ALJ's decision for the reasons stated above and the reasons stated in the R&R.

    SO ORDERED.

                                s/Avern Cohn  
                                AVERN COHN  
                                UNITED STATES DISTRICT JUDGE

Dated:  July 20, 2006

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, July 20, 2006, by electronic and/or ordinary mail.

                                s/Julie Owens  
                                Case Manager, (313) 234-5160